**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION - DETROIT**

**IN THE MATTER OF:**

Fieldstone A&E, LLC,

*d/b/a* Fieldstone Engineering,

*d/b/a* Fieldstone A & E,

*d/b/a* Fieldstone Architecture,

*d/b/a* Fieldstone Architecture & Engineering,

Debtor.

Bankruptcy Case No. 26-48494-tjt

Hon. Thomas J. Tucker

Chapter 11

*Subchapter V*

**DECLARATION OF RYAN RASMUSSEN**
**IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS**

In support of the above captioned Debtor's Voluntary Petition and first day pleadings, I, Ryan Rasmussen, declare as follows:

1. Except as otherwise stated herein, I make this declaration upon personal knowledge and, if called as a witness, could competently testify to the facts contained herein.

2. I am the sole member of the Debtor and the responsible person for the Debtor.

3. On July 30, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief in this Court under chapter 11, subchapter V, of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

4. The Debtor continues to manage and operate its business as debtor-in-possession pursuant to, *inter alia*, § 1184 of the Bankruptcy Code.

5.     I have been informed that a subchapter V Trustee has not yet been appointed or designated in this case.

6.     The Debtor was formed in late 2010 and commenced operations in 2011. The Debtor is a full-service architecture, engineering, and interior design firm. The Debtor's products and services address the needs of single-family, multi-family, and commercial construction. The Debtor has integrated design services that understand both the architecture and engineering necessary for construction projects. The Debtor is extremely versatile and can handle any size project from a 1,500-square-foot single family home to 40,000-square-foot club houses. The Debtor works directly with home builders and specializes in creating a theme and consistency in the project.

7.     The Debtor employs approximately one hundred twenty-four (124) employees (the "Employees") in the ordinary course of its business and incurs obligations to them for compensation for their services. Fifty-one (51) of the Employees are paid hourly wages while seventy-three (73) receive a salary.

8.     Debtor's cash flow is derived from new building projects and existing projects that require modification to the existing plans..

9.     A key reason for filing is Debtor is currently defending dozens of construction defect matters throughout Florida, which have substantially increased in number and severity over the last few years.  . Some of these matters arise under

Chapter 558, Florida Statutes, which establishes a pre-suit notice and response process and does not itself constitute a lawsuit, judgment, or finding of liability. Others are actively in litigation or arbitration. The notices and pleadings predominantly describe deficiencies in the construction and installation of building components such as windows, stucco, siding, sliding glass doors, roofing, drainage, and water intrusion. Debtor is typically named as one of many project participants, and in most matters no specific error in Debtor's design has been identified. Nevertheless, Debtor has been unable to resolve these matters. Several of the matters also include contractual defense and indemnity claims by developers based on agreements requiring Fieldstone to defend and indemnify developers for losses allegedly relating to Fieldstone's professional services. The contractual defense obligations apply irrespective of whether Debtor is ultimately determined to have been negligent. In some of these cases developers have not yet quantified their demands, and arbitration proceedings have either been initiated or are anticipated. One developer, however, has quantified its demand. The substantial majority of these matters remain in Chapter 558 pre-suit posture or the early stages of litigation, and a few are currently stayed. In most matters, destructive testing, expert disclosure, and cost-of-repair discovery have not been completed, and no determination of Debtor's responsibility has been made. Overall, the pending matters expose Debtor to substantial disputed, contingent, and unliquidated liabilities, although many

claims remain unproven, several are subject to arbitration or procedural stays, and Debtor continues to assert significant defenses regarding scope of work, contractor responsibility, and contractual allocation of risk.

10. Debtor maintains professional liability insurance on a claims-made basis (meaning coverage is triggered at the time a claim is made and not when Debtor performed its services), with an aggregate limit of approximately $2,000,000 per policy year and a deductible of approximately $75,000 per claim. Defense costs erode that aggregate limit rather than being payable in addition to it. Many of the pending matters were first reported within a single policy year, and defense costs alone are projected to be more than the available aggregate coverage. Defense and indemnity exposure is in addition to those defense costs and, because most matters have not progressed to destructive testing or expert disclosure, cannot presently be quantified. Debtor's available insurance is therefore likely to be exhausted by the cost of defending these matters before the underlying claims are adjudicated or valued. Debtor's contracts also generally require professional liability protection for ten years following completion of a project, while extended reporting coverage is available to Debtor only in five-year increments and at substantial cost.

11. The Debtor has well in excess of 500 notice parties. The majority of these parties hold claims based on alleged construction defects ("Construction Defect Claims"). Other creditors include vendors, including contractual

counterparties, and other third parties holding general unsecured claims for amounts due as of the Petition Date.

12. The Debtor submits that the bankruptcy process is the best forum in which to implement appropriate procedures to equitably determine the rights of and allocate recoveries regarding the Construction Defect Claims.

13. The Debtor filed this bankruptcy to reorganize its financial affairs. The Debtor is confident in its ability to emerge from its reorganization as a stronger, more efficient, operation while furthering its mission of providing customers with quality service.

14. In order to minimize the potentially adverse effects of the bankruptcy filing on its business the Debtor has requested first day relief (collectively, the "First Day Motions") that are intended to allow the Debtor to maintain ongoing business operations and fulfill its duties as debtor in possession.

15. The First Day Motions are:

    a. First Day Motion for Entry of Order (A) Authorizing Debtor to Pay Employee Obligations; and (B) Directing Financial Institutions to Honor Outstanding Employee-Obligations Payments (the "Employee Obligations Motion");

b.	First Day Motion for Entry of Order Authorizing the Continued Use of Debtor's Prepetition Cash Management System, Bank Account, and Business Forms (the "Cash Management Motion");

c.	Debtor's Motion for Order (I) Establishing Deadlines for Filing Proof of Claim; (II) Approving the Form and Manner of Notice of the Bar Dates; and (III) Approving the Form of Publication Notice (the "Deadline and Notice Motion"); and,

d.	First Day Motion for Entry of Order Establishing a Special Service List (the "Special Service List Motion").

16.	The majority of the value of the Debtor arises from its ongoing operations and ability to continue to provide services to its customers. Without authority of the Court granting the relief requested in the First Day Motions, the Debtor would suffer irreparable harm because it will be forced to immediately shut down.

**Employee Obligation Motion**

17.	As of the Petition Date, the Debtor employs approximately 124 employees (the "Employees") in the ordinary course of its business and incurs obligations to them for compensation for their services. Fifty-one (51) of the Employees are paid hourly wages while seventy-three (73) receive a salary. Three

(3) of the Employees may be insiders, as defined in § 101(31) of the Bankruptcy Code.

18. The Debtor has costs and obligations with respect to the Employees relating to the period before the Petition Date. Certain of these costs and obligations are due and payable, while others will become due and payable after the Petition Date in the ordinary course of the Debtor's business.

19. Before the Petition Date, and in the ordinary course of its business, the Debtor typically paid obligations relating to wages (the "Wages") bi-weekly.

20. The Debtor is also required by law to withhold from its Employees' Wages applicable amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authority (collectively, the "Taxing Authorities").

21. Furthermore, the Debtor is required to make payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and together with the Withholding Taxes, the "Payroll Taxes").

22.     In addition to the foregoing and in the ordinary course of its business, the Debtor maintains employee benefit programs (the "Benefits"), for which the Debtor contributes all or a part of the expenses.  These Benefits include:

a.     Health Insurance Plans:  The Debtor provides certain Employees, though not any equity interest holders, healthcare coverage administered by Health Choice of Michigan.  The Debtor pays approximately 70% of its Employees' annual health care coverage, 50% of the premiums for dental insurance coverage and 50% of the premiums for vision insurance coverage.

b.     Flexible Time Off:  All full-time Employees who work an average of 40 hours per work week may take paid leave as needed. Employees are expected to maintain a 90/10 ratio; working hours should account for more than 90% of total hours, with less than 10% allocated to flexible time off.

23.     Absent the entry of an Order granting the First Day Motion for Entry of Order (A) Authorizing Debtor to Pay Employee Obligations; and (B) Directing Financial Institutions to Honor Outstanding Employee-Obligations Payments, for the reasons stated therein and herein, the Debtor and its employees will suffer immediate and irreparable harm.

**Cash Management Motion**

24.     Prior to the Petition Date, the Debtor  maintained the following checking accounts:

25. The Huntington National Bank: Checking ending 8396,

26. The Huntington National Bank: MMA ending 7844,

27. Bank of America: Checking ending 9080, and

28. Bank of America: Checking ending 9093.

29. The Debtor is not seeking relief as to The Huntington National Bank accounts and will close the same pursuant to the applicable United States Trustee guidelines.

30. The Prepetition Accounts serve as the Debtor's principal depository account through which substantial ACH payments from customers are received and processed. Many of the Debtor's customers are large corporate entities that require significant lead time and internal approval processes to modify payments instruction.

31. Accordingly, an immediate closure of the account would likely disrupt the Debtor's cash follow and business operations. In addition, the Debtor utilizes Bank of America's Cash Pro platform to process payroll, and transitioning payroll services to a new financial institution would require substantial coordination, testing, and implementation efforts to ensure employees are paid timely and accurately.

32. Put simply, the closure of the Prepetition Accounts would cripple the Debtor at this crucial and early stage of its bankruptcy case and would cause serious and material issues.

## Special Service List Motion

33.     The Debtor seeks entry of an order establishing a special service list under Fed. R. Bankr. P. 2002 and E.D. Mich. LBR 2002-1.

34.     There are more than 500 creditors and notice parties involved in the Debtor's Chapter 11 case and included on the Debtor's matrix.

35.     The establishment of the Special Service List is in the best interest of the Debtor's estate because notice to all creditors would impose a substantial administrative and economic burden on the Debtor.

## Deadline and Notice Motion

36.     Unlike ordinary trade claims, construction defects and professional liability claims frequently involve latent conditions that may not become apparent until years after a project's completion. Consequently, many potential claimants including subsequent property owners, condominium and homeowners' associations, insurers, and successor developers may not presently be identifiable despite the Debtor's diligent review of its books and records. The uncertainty surrounding these potential claims materially impacts the Debtor's ability to accurately determine its liabilities and formulate a feasible plan of reorganization under Subchapter V of chapter 11.

37.     To facilitate the orderly administration of this bankruptcy case, the Debtor seeks entry of an order establishing deadlines for the filing of proofs of claim,

including a General Bar Date, Governmental Bar Date, and Rejection Bar Date, together with procedures governing the submission of claims. The Debtor also requests approval of comprehensive notice procedures that provide actual notice by first-class mail to all known creditors and publication notice reasonably calculated to reach unknown claimants, particularly those who may possess latent construction defect or professional liability claims. These procedures are intended to satisfy the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and constitutional due process.

38. Establishing the requested bar dates and approving the proposed notice procedures at the outset of this case is critical to identifying the universe of claims against the estate, providing certainty regarding the Debtor's liabilities, and promoting the efficient administration of this Chapter 11 proceeding. Without a comprehensive claims process, the Debtor's ability to reconcile claims, negotiate with creditors, formulate a confirmable plan of reorganization, and successfully emerge from bankruptcy would be substantially impaired. Accordingly, the Debtor believes that the requested relief is necessary to maximize value for all creditors and facilitate a prompt and successful reorganization.

## <u>Conclusion</u>

39. I have read, reviewed, and approved each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare to the best of my knowledge, under penalty of perjury, that the above statements are true and correct.

**FIELDSTONE A&E, LLC**

By: /s/ Ryan Rasmussen
Ryan Rasmussen
Its: Sole member and Responsible Person

Dated: July 30, 2026